UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER M. THRASHER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 2:19-cv-01007-JHE |
| COMMISSIONER JEFFERSON S. DUNN, et al., | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

While an inmate at Donaldson Correctional Facility ("Donaldson"),[1] Plaintiff Christopher M. Thrasher filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 for violations of his civil rights and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), naming the following defendants: Head Chaplain George Adams, Warden Christopher Gordy, Pastoral Program Supervisor Thomas Woodfin, and Prison Commissioner Jefferson Dunn. (Doc. 1 at 2-3). Thrasher seeks injunctive relief. (*Id.* at 5). At this stage of litigation, Thrasher's sole remaining claim is a RLUIPA claim against defendants Woodfin and Dunn in their official capacities based on Alabama Department of Corrections ("ADOC") denying his request for kosher meals. (*See* docs. 22 & 24).

**I. Procedural History**

On September 11, 2019, the magistrate judge previously assigned to this case entered an Order for Special Report directing the Clerk to forward copies of the complaint to each of the named defendants and directing Defendants to file a special report addressing Thrasher's factual allegations. (Doc. 7). The previous magistrate judge advised Defendants the special report could

---

[1] On May 26, 2020, the plaintiff was transferred to Limestone Correctional Facility in Harvest, Alabama. (Doc. 21).

be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (*Id.*).

On January 2, 2020, Defendants filed a special report, supplemented by affidavits and/or other evidence. (Doc. 16).  On January 27, 2020, the previous magistrate judge notified the parties that the court would construe the special report as a motion for summary judgment and notified Thrasher he had twenty-one days to respond to the motion for summary judgment by filing affidavits or other material.  (Doc. 17).  He also advised Thrasher of the consequences of any default or failure to comply with Fed. R. Civ. P. 56.  (*Id.*).  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  On January 27, 2020, Thrasher filed a response.  (Doc. 20).

On July 17, 2020, the undersigned entered a Report and Recommendation addressing the motion for summary judgment.[2]  (Doc. 22).  The undersigned recommended the motion for summary judgment be granted as to all claims brought on behalf of another person. (*Id.*). As to Thrasher's claims seeking personal redress, the undersigned recommended the motion for summary judgment be granted as to Defendants Adams and Gordy, and to Defendants Woodfin and Dunn to the extent they are sued in their individual capacities. (*Id.*).  To the extent Defendants Woodfin and Dunn are being sued in their official capacities, the undersigned recommended the motion for summary judgment be granted as to Thrasher's First and Fourteenth Amendment claims but denied as to his RLUIPA claim. (*Id.*).  On August 14, 2020, United States District Judge Abdul K. Kallon adopted the report and accepted the recommendation, then referred the case back to the undersigned for further proceedings.  (Doc. 24).

---

[2] This case was referred to the undersigned on June 12, 2020, when the magistrate judge to whom it was previously assigned retired.

On October 14, 2020, the Clerk of Court entered into the record the parties' unanimous consent to have a magistrate judge conduct all further proceedings in this case pursuant to 28 U.S.C. § 636(c) (doc. 31), and then reassigned this case to the undersigned. (doc. 32).

On November 9, 2020, the remaining defendants, Woodfin and Dunn, moved for leave to file an out-of-time response to the RLUIPA claim. (Doc. 35). The undersigned granted the motion on December 4, 2020, providing until February 2, 2021, for Defendants to file a motion for summary judgment regarding Thrasher's RLUIPA claim. (Doc. 36).

On February 2, 2021, Defendants moved for summary judgment. (Docs. 37-39). Thrasher has filed a response in opposition to the motion. (Doc. 42). Although provided an opportunity to file a reply brief (*see* doc. 43), Defendants have filed nothing further.

## II. Standard of Review

Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). A *pro se* pleading "is held to a less stringent standard than a pleading drafted by an attorney" and is liberally construed. *Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015).

### III. Summary Judgment Facts

Thrasher is an ADOC inmate incarcerated since 1993. (Doc. 39-1). For the past 28 years, Thrasher has eaten non-kosher meals while in ADOC custody and control. (*See* doc. 1; doc. 39-2). In 2018, Thrasher requested ADOC provide him and other Jewish inmates with Kosher meals. (*See d*oc. 1). ADOC denied Thrasher's request on January 17, 2019. (*Id.* at 12).

In his response to defendants' Special Report, Thrasher lists various religious events that occurred in his life to support his contention he has a genuine passion for his Jewish heritage and the Jewish religion. (*See* doc. 20 at 3). In addition to the events on the timeline, the defendants point out Thrasher has acquired various tattoos, which they say are inconsistent with Thrasher's professed Jewish faith. (*See* doc. 38 at 2; doc. 39-1).

4

Defendant Woodfin is the Pastoral Programs Supervisor for ADOC and has served as Chaplain for almost fifteen years and as Pastoral Programs Supervisor for over eight years. (Doc. 39-2 at ¶1). As Pastoral Program Supervisor, Woodfin leads the Religious Activities Request Committee ("RARC") for ADOC. (*Id.* at ¶2). RARC considers inmates' religious accommodation requests and grants or denies their requests. (*Id.*). RARC considered Thrasher's request for kosher meals in 2018. (*Id.* at ¶3). At that time, and presently, ADOC provides a pork- and catfish-free diet, which it believes eliminates the most offensive food for most religious groups. (*Id.*).

Woodfin states that, because the cost of constructing separate kosher kitchens at each of ADOC's facilities would be exorbitant, he researched the possibility of providing pre-prepared kosher meals to inmates from vendors Affordable Kosher and My Own Meal®. (Doc. 39-2 at ¶4). From Woodfin's research, the price-per-meal ranged from $2.75 to $8.00. (*Id.*). He provided the results of his research to Rodney Blankenship, ADOC's Director of Accounting, so Blankenship could calculate the impact providing kosher meals would have on ADOC's budget. (*Id.*).

Woodfin estimates at least 3,000 inmates would request kosher meals if they were available. (Doc. 39-2 at ¶6). Woodfin has observed major changes in religious programming during his tenure at ADOC. (*Id.*) In the late 1990s, sweeping changes to Native American spiritual practices were introduced, and, more recently, there have been changes to the policy regarding facial hair based on religious preference. (*Id.*). In Woodfin's experience, these changes have led to a significant increase in conversions of practitioners to the respective religions to have access to newly allowed "novelty experiences" or "grooming regulations." (*Id.*). Woodfin expects any religion-related new and novel food option would generate inmate conversion because non-institutional food has "great influence and draw among inmates." (*Id.* at ¶8).

Non-institutional food is also used to reward and as an incentive for good behavior in institutions. (*Id.*). Outside food has been used to encourage participation in programs such as Faith Character Based Residential Housing Unit programs and even COVID-19 inmate testing. (*Id.*). Non-institutional food has also been used to reward completion of programs such as Trade School, Substance Abuse Programs, etc. programs. (*Id.*). Woodfin asserts food is known to attract inmates. (*Id.*).

Blankenship, who has been the Director of Accounting for ADOC for ten years, considered the financial impact to ADOC of providing kosher meals. (Doc. 39-3 at ¶2). He concluded constructing new kosher kitchens at each of ADOC's facilities would be the most expensive way to provide kosher meals to inmates. (*Id.* at ¶3). Blankenship asserts the less expensive option, providing prepackaged kosher meals, would still be an exorbitant cost for ADOC. (*Id.*).

In fiscal year 2020, based on the calculation of "raw food cost per inmate, per day," ADOC spent $14.9 million of its budget on food. (Doc. 39-3 at 39-1 ¶4). Blankenship provides the following breakdown: To provide three meals a day to one inmate costs approximately $2.07 per day, which is approximately $755.55 annually. (*Id.*). For 19,681 inmates (the average number of inmates in fiscal year 2020), the would be a total food cost of $14.9 million dollars. (*Id.*).

To calculate the costs of providing prepackaged kosher meals, Blankenship used 3,000 as the approximate number of inmates declared as Jewish practitioners who would request kosher meals. (Doc. 39-3 at ¶5). However, Blankenship noted it is common for inmates to change their religious declaration to access a novelty item or experience offered to that religious group, so, he believed, ADOC would be required to provide more than 3,000 inmates with kosher meals. (*Id.*).

Based on Woodfin's research, Blankenship calculated it would cost *at least* an additional $6.8 million (low-range price meals) a year to provide kosher meals to 3,000 inmates, and possibly

6

an additional $13.4 million (mid-range price meals). (Doc. 39-3 at ¶7). According to Blankenship, providing a kosher meal option would make the food cost go from 2.6% of overall ADOC expenses to approximately 3.8% to 5% of the budget. (*Id.* at ¶9).

Each year, ADOC must request general fund appropriations from the Alabama Legislature, and the Alabama Director of Finance must approve the budget. (Doc. 38 at ¶10). Approximately 86% of the ADOC's budget is allocated toward the top budget items, which are personnel and benefits, medical and mental health services, food, utilities, and Community Corrections. (*Id.*).

According to Blankenship, if ADOC were to allocate this amount of money to kosher meals, the money would have to be taken from other items in the budget. (Doc. 39-3 at ¶11). He asserts some costs would have to be eliminated to pay for kosher meals. (*Id.*). The money allocated to staffing, overtime payments, or medical expenses would likely decrease, because these are the largest expenditures and the areas most likely to be reduced. (*Id.*). The reduction of funds in any of these areas would cause a direct and negative effect on the security of staff and inmates and, ultimately, on the control of the facilities. (*Id.*). Blankenship opines the cost of providing kosher meals is too expensive and prohibitive for ADOC. (*Id.* at ¶12).

The Federal Bureau of Prisons' ("BOP") budget for 2020 was $7,061,953,000 (Doc. 39-4 at 5). BOP budgeted $405,137,000 for food in 2020, which was to feed 180,210 inmates. (*Id.* at 25). Based on these figures, the BOP budgeted $2,248 dollars per inmate annually, which is $6.16 per inmate, per day.

Additionally, ADOC is also involved in ongoing litigation where it has been ordered to update facilities to comply with the Americans with Disabilities Act. (Doc. 39-5). There is also the *Braggs v. Dunn* litigation, in which ADOC has been ordered to hire more officers. (Doc. 39-6).

## IV. Analysis

RLUIPA is a broad protection for religious liberty prohibiting government actors from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." *Knight v. Thompson*, 797 F.3d 934, 943 (11th Cir. 2015) (citing 42 U.S.C. § 2000cc–1(a)).

Under RLUIPA, the plaintiff bears the initial burden of making a *prima facie* showing that the challenged law, regulation, or practice substantially burdens his exercise of religion. *Holt v. Hobbs*, 574 U.S. 352, 360 (2015). When the court determines the plaintiff established a *prima facie* case, the burden then shifts to the government to demonstrate that the action is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *See id.*

Moreover, as noted in *Knight v. Thompson*,

> RLUIPA protects, to a substantial degree, the religious observances of institutionalized persons, it does not give courts carte blanche to second guess the reasoned judgments of prison officials. Indeed, while Congress enacted the RLUIPA to address the many "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, it nevertheless anticipated that courts entertaining RLUIPA challenges "would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter v. Wilkinson*, 544 U.S. 709, 716–17 (2005) (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)). The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests." *Id.* at 722.

*Knight*, 797 F.3d at 943.

Defendants acknowledge "the Court noted that Thrasher met his initial burden and the Defendants did not satisfy their burden to prove the challenged regulation is the least restrictive

8

means of furthering a compelling government interest." (Doc. 38 at10-11) (citing doc. 22 at 15). Thus, the sole issue here is whether Defendants have now presented sufficient evidence to satisfy their burden, i.e., that denying Thrasher kosher meals is the least restrictive means of furthering a compelling governmental interest. (*See id.* at 11-13).

Defendants contend if ADOC is required to provide kosher meals to observant Jewish inmates who can validate their claims to be Jewish, the corresponding food budget increase would negatively affect the security of staff and inmates and ultimately the control of the facilities.[3] (Doc. 38 at 11). Defendants suggest that safety and security of staff and inmates is a more compelling interest than providing kosher meals to a portion of the prison population. (*Id.*).

Next, Defendants also point out ADOC's situation is unlike that of BOP, highlighting the fact that BOP's inmate per day food budget is almost three times ADOC's inmate per day food budget. (Doc. 38 at 11). This is true. Although BOP houses approximately nine times as many inmates as ADOC, BOP has a food budget approximately 27 times more than ADOC. Therefore, BOP is able to spend three times as much per inmate for food. This certainly impacts the feasibility of providing kosher meals.

Defendants also attempt to distinguish *United States v. Secretary, Fla. Department of Corrections*, 828 F.3d 1341 (11th Cir. 2016), from this case. (*Id.* at 12). Defendants point out that, in that case, Florida Department of Corrections ("FDOC") had previously provided kosher

---

[3] The claims Thrasher brought on behalf of other inmates were dismissed at the special report stage. (*See* doc. 24). Therefore, there is some question about whether Defendants can assert the hypothetical institutional harm that would result from providing kosher meals to *all* Jewish inmates when Thrasher's only remaining claim seeks to have kosher meals provided to him alone. *See Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened."). Nevertheless, because Defendants have not satisfied their dual burden, the undersigned considers Defendants' arguments as they have stated them.

meals to inmates, and Defendants in this case have specifically shown how much it would cost ADOC to feed 3,000 Jewish inmates, so the calculations are not speculative. (*Id.*).

Finally, Defendants point to the fact ADOC has been ordered in other federal litigation to hire over 1,200 correctional staff members and to remove physical barriers to essential services for disabled inmates. (*Id* at 12-13). Defendants argue the money needed to provide kosher meals would prevent it from being able to afford to comply with these orders. (*Id.*).

Defendants' burden is two-fold. Defendants must demonstrate "imposition of the burden on that person is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." *Knight*, 797 F.3d at 943 (citing 42 U.S.C. § 2000cc–1(a)). As an initial matter, defendants may not shift this burden to the limited appropriations from the Alabama Legislature. RLUIPA does not distinguish between parties of the government. *See* 42 U.S.C. § 2000cc-1(a). As the Eleventh Circuit has recognized, "[i]f [Defendants] must provide kosher meals, then the legislature must appropriate enough funds to honor that obligation." *Sec'y, Fla. Depart. of Corrs.*, 828 F.3d at 1348. Additionally, the Eleventh Circuit has characterized Defendants' argument that if ADOC provides kosher meals to some inmates, other inmates will seek this accommodation as a "nonstarter." *Id.* Following the Supreme Court's lead, the Eleventh Circuit has explained "[a]t bottom, this argument is but another formulation of the 'classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions.'" *Id.* (quoting *Holt v. Hobbs*, 574 U.S. 352, 368 (2015)). This argument is not compelling. Safety and cost management are certainly compelling government interests; however, Defendants must show ADOC's policy of denying kosher meals in fact furthers these interests. *See Rich v. Sec'y, Fla. Dept. of Corrs.*, 716 F.3d 525, 533 (11th Cir. 2013)

However, unlike the Secretary in *United States v. Secretary, Florida Department of Corrections*, Defendants do provide some "concrete evidence concerning how other operations of the prison system would be affected by these increased costs," 828 F.3d at 1347. For example, Defendants present evidence that providing kosher meals for one year to 3,000 inmates would cost as much as hiring approximately 367 correctional officers, and it's been ordered to hire 1,200. (*See* doc. 38 at 12). Likewise, there is evidence that providing kosher meals for one year to 3,000 inmates would require ADOC to forego ADA remediation of two major facilities, and it has been ordered to remediate 14 facilities. (*Id.* at 13). Thus, based on the numbers and evidence provided, Defendants provided evidence that using money to pay for kosher meals would prevent it from performing other operations essential to maintaining safety and control.

Thus, here, it appears Defendants may have shown the current situation with Alabama prisons is different from that of other systems where they have been able to provide kosher meals. Nevertheless, this result is uncomfortable. Although courts "do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," *Knight*, 797 F.3d at 943, RLUIPA itself recognizes it "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc3(c). Defendants' argument boils down to saying ADOC cannot afford to provide kosher meals to all Jewish inmates because it must first comply with other court orders finding unconstitutional conditions.

However, even if Defendants have presented sufficient concrete evidence regarding how the denial of kosher food furthers its interest in not only containing costs, but in maintaining its budget at it relates to institutional safety and control, Defendants have not met their burden as to the "least restrictive means" component. Defendants contend ADOC would be unable meet its

11

other needs if ordered to provide kosher meals to "observant Jewish inmates housed in ADOC facilities who can also validate their claim to be Jewish[.]"  (Doc. 38 at 13).  The least restrictive means standard is "exceptionally demanding" and requires the government to show it lacks other means to achieve its goal without imposing a substantial burden on the exercise of religion.  *Sec'y, Fla. Depart. of Corrs.*, 828 F.3d at 1348 (citing *Holt v. Hobbs*, 574 U.S. 352, 365 (2015)).  This means, if there is a less restrictive means available, the government must use it.  *Id.* (citing *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815 (2000).

Defendants use the current number of inmates who identify as Jewish, along with the proposition that other inmates would identify as Jewish to obtain these meals to arrive at the total of 3,000 inmates who would want and qualify for kosher meals.  (*Id.* at 4).  However, Defendants fail to explain what it means to be an "observant Jewish inmate[] housed in [an] ADOC facilit[y] who can also validate their claim to be Jewish" and why less restrictive alternatives, such as "enforcing rules that limit access to, and continued participation in," a kosher meal program in order to "screen[] out insincere inmates," *Sec'y, Fla. Dep't of Corr.*, 828 F.3d at 1349, would not further their stated interest.  *See Holt*, 574 U.S. at 369-70 (noting that if prison officials suspect a prisoner is seeking religious accommodations in bad faith, they "may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic"); *Williams v. Annucci*, 895 F.3d 180, 192 (2d Cir. 2018) (observing that "narrowing the pool of potential accommodations is what the sincerity requirement accomplishes . . . .").  In fact, Defendants' arguments there would be an explosion of inmates identifying as Jewish in order to get kosher meals imply they have not even considered the possibility of screening out inmates only interested in the novelty of different food.  Defendants simply say there would be too many, but they provide no parameters that would allow that conclusion at the summary judgment stage.

Without such evidence, there is a genuine issue of material fact as to whether denying kosher meals is the least restrictive means to further the compelling governmental interest of maintaining institutional safety and control.[4]

## V. Conclusion

For the reasons stated above, Defendants' motion for summary judgment (doc. 37) is **DENIED**.

---

[4] If Defendants are in violation of RLUIPA, before the court can issue an injunction, the court must ensure that the injunctive relief sought meets the requirements of the PLRA. Under the PLRA, any injunctive relief:

> shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1). The Eleventh Circuit interprets this provision to require a district court to make particularized findings as to each element of the injunction and perform a need-narrowness-intrusiveness analysis that provides a separate explanation as to each element. *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir.2000). However, a court need not do this about any facts or factors not in dispute. *Id*. at 785 n. 8.

> In discussing the requirements of the PLRA, the Supreme Court has explained:
>
> Narrow tailoring requires a "fit" between the remedy's ends and the means chosen to accomplish those ends. The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation. This Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution. But the precedents do not suggest that a narrow and otherwise proper remedy for a constitutional violation is invalid simply because it will have collateral effects.

*Brown v. Plata*, 563 U.S. 493, 531 (2011) (internal citations, quotation marks, and brackets omitted).

DONE this 15th day of September, 2021.

                                                         **JOHN H. ENGLAND, III**
                                                         UNITED STATES MAGISTRATE JUDGE